[No. 12353.  Department One.  October 11, 1915.]

NORTHERN PACIFIC RAILWAY COMPANY, *Appellant*, v.
BENTON COUNTY, *Respondent.*[1]

TAXATION—ASSESSMENT—EXCESSIVENESS—"SPECULATIVE VALUE"—
EVIDENCE—SUFFICIENCY. The assessment of two hundred sections of
railroad lands at from $2.86 to $1.91 an acre (fifty per cent of the
cash value) is shown to be so grossly in excess of the fair cash
value as to be arbitrary and made upon a fundamentally wrong basis,
where it appears that it was dry grazing land, practically valueless
and of no sale or market value, worth for grazing not exceeding $13
a section; and the assessed value, which did not rise to the dignity
of speculative value or probability of value within the span of a
lifetime, was confirmed below on an "inference" that the company
had withheld the same from sale for a "definite purpose" regarding
the lands, and because there could be no possible comparison of
values on account of the withdrawal of government lands constitut-
ing the balance of the area in that locality; since other comparisons
of value existed, and a withholding of the lands from sale by an
owner adds nothing to its present taxable value.

Appeal from a judgment of the superior court for Benton
county, Holcomb, J., entered July 9, 1914, in favor of the
defendant, in an action for equitable relief, tried to the court.
Modified.

*Geo. T. Reid, J. W. Quick,* and *L. B. da Ponte,* for ap-
pellant.

*Hal H. Cole,* for respondent.

CHADWICK, J.—This is a suit in equity, brought by ap-
pellant to compel respondent to cancel as excessive certain
taxes levied upon its lands in Benton county. The taxes for
the years 1912 and 1913 are attacked. The area, being a
part of the governmental grant to the railway company, is
161,534.52 acres. The value of this acreage was equalized
for the year 1912 at $463,920, upon which a tax of $10,-
874.19 was levied. In the year 1913, the equalized value was

[1]Reported in 151 Pac. 1123.

reduced to $309,975, upon which a tax of $9,269.41 was levied.

It is contended that the true value of the whole acreage for the years 1912 and 1913 is no more than $201,377. It is alleged that the assessments and values are so far in excess of a just valuation and assessment that the assessment is in law arbitrary and oppressive; that the tax is levied upon a fundamentally wrong basis and deprives appellant of a substantial right.

Respondent contends that the assessments and equalizations were made in good faith, at a fair valuation, and that the assessment is not disproportionate in any degree to other property of like kind and character situate within the county. The equalized value for the year 1912 is equivalent to $2.86 per acre; for the year 1913, $1.91.

The court found, and appellant accepts the finding, that property in Benton county was assessed at fifty per cent of its true value for the years 1912 and 1913. Upon this percentage it is insisted that the failure of the assessor to take fifty per cent of the true value as found by him operates to put a value on the land of $5.72 an acre for 1912, and $3.82 plus for the year 1913. In short, the contention of appellant is that the value as found should have been reduced 50 per cent for the purposes of taxation, and that a failure to do so leaves a book value of $5.72 and $3.82 per acre, and further, that the value as found and taxed at its face, as well as the value if treated at fifty per cent of the true value, is so grossly in excess of the fair cash value of the property as to operate as a constructive fraud upon the appellant.

The court reduced the value per acre of several tracts from $25 (1912), $2.50 (1913) to $2.50; from $20 (1912), $25 (1913) to $2.50; from $1 and $1.50 to $0.10; from $5 to $1, and confirmed the assessment in all other particulars.

An issue of estoppel was raised by respondent. This was correctly decided in favor of the appellant. The only issue for our determination is, therefore, whether the lands were so

grossly overvalued as to invite the interposition of a court of
equity.  The lands are in several localities.  We think there
is enough to sustain the judgment of the court as to all the
land except that which is described in the record as the two
hundred sections lying north of the horn of the Yakima river.
Our discussion of the evidence and our conclusions have par-
ticular reference to that tract.

There are certain facts made clear by the testimony of the
witnesses on both sides.  As the land is now, it is unfit for
any use other than grazing.  It is arid land covered with
sage brush, and in part covered with rocks and sand.  It
has no present sale value other than as spring grazing land
for sheep, being too dry to pasture cattle.  In the whole area
covered by the land there are two wells of indifferent quality
and small flow, and possibly one or two springs.  For a
few years prior to the year 1911, and coincident with what is
locally known as the Hanford boom, some of the lands, as
well as government land in the even sections, were regarded
as having a speculative value.  As we remember, but little,
if any, of the railroad land was sold, but there were some gov-
ernment homestead entries.  The speculative value of the
lands rested upon the idea that irrigated lands were of great
value, and that certain high line canals were projected—on
paper—which if completed would start the desert into life.
Some of the land was under a paper ditch (a part of the
Hanford project) which was to be supplied by pumping,
and a part of it is under a paper ditch—gravity—known as
the Northern Pacific High Line.  The Hanford project has
failed as a business project, and there is no present or even
remote prospect of that or the other ditch being built.  Of
all those who settled upon government land, only two remain,
and they have lived without profit from the land.  The boom
which sustained the fancied value of the land burst about
1911, and since that time the only prices put upon the lands
by those who had acquired title (government) is a "get-

away" price.    Most of the land has been abandoned without price.

The assessor and his deputies all swear that they acted in good faith, and we have no disposition to question it; but it nevertheless seems to us that all of the evidence sustains the contention of appellant that the value of the lands are grossly overestimated.    The testimony of appellant's officers and agents, and of men who were skilled in land values and who personally cruised the lands, was that the land is only fit for grazing and its lease value is $13 per section, which is the best price obtainable.    The following excerpts from the abstracted testimony of respondent's witnesses will give some idea of the lands and their value.

"The land was bought by speculators.    Those people have proved up and gone away.    There is nothing to sustain life until the land is watered."

"It is my opinion that nobody will ever go back on that land until there is water, or power is cheap enough to pump from wells.    All the canal companies that have gone into pumping water have failed."

"The last few years, practically all the people in this part of the country have left.    It is not a safe farming proposition."

Speaking of the two settlers:

"Most of the time they go out to work a while and then go back to the ranch.    They do odd jobs to help make a living. There is not a soul in that district making a living on a farm except on Benson's place.    (There is a spring on Benson's place.)    There is nothing but bunch grass growing in that district.    There is no cattle.    It is a sheep proposition."

"There is nobody living up there but myself.    That is a grazing country.    No crops are grown there.    I am keeping house on a homestead."

"I viewed all the land upon which I made my assessments. I assessed this 80 acres on Goble Mountain at $4,000.    On top of Goble Mountain it is not worth very much.    The Board of Equalization reduced it to $77."

"They could raise alfalfa on section 13 if it had water. It had no water.    I do not know where the water is coming

from.  My assessments were made on the basis that if they could get water the land would be good.  If it had no water it has speculative value."

"These lands are simply grazing lands.  I have no idea what they can be leased for."

"There is a lot of sand blows in there. . . . That was full of sand blows.  The worst of the land was that furtherest from possible irrigation.  I believe I placed a valuation of $3 per acre.  They are not agricultural lands in any sense.  They have other values besides grazing.  They have a speculative value.  There is no prospect of getting water now.  The prospects I considered existed in 1912 have vanished."

"Q.  Did you assess this land as agricultural or grazing land?  A.  Partly as speculative value and as part of the same.  This land is under a projected canal.  It has not been determined whether water can be had there."

"So far as I know $13 per section is a fair value for grazing.  I do not know whether they could get any more.  I know of no crop that can be raised there."

"I would say fifty per cent of it is agricultural land that could be cultivated where water is available."

"Q. . . . Do you think that it is a business proposition farming that desert out there?  A.  It is not now.  Q.  When will it be?  A.  We are living in hopes of its prospective value.  Q.  Do you know when it is to be realized?  A.  I do not know.  I hoped it would be before this."

After reducing the value of a part of the land as aforesaid, the court refused to reduce the remainder, saying:

"The lands are wild and unimproved, and the plaintiff contends that they are valuable only or chiefly for grazing purposes, and introduced evidence to show at what price per annum the lands are leased for grazing purposes, which is approximately from four cents down to about two cents per acre per annum, and by a process of *a priori* reasoning attempt to show what the real, actual, fair cash value of said land, based upon said rental valuation, is.  The trouble with this reasoning, to begin with, is that the railroad which owns all the odd-numbered sections in this region and the Federal Government and the State of Washington, which owns all the even-numbered sections in this region, a number of years ago in collaboration with each other withdrew all of said

land from the market and from entry or sale and are still withholding them from market and from entry, and there is therefore no possible comparison of values that can be made, and there is no other use to which the plaintiff can devote their lands other than by leasing for grazing purposes in large tracts, as there is no competition for any other use. I am, therefore, not much impressed either with their reasoning as to the valuation based on rental price or their conclusion as to the market value. . . . There is no market value, because a market is denied them. It is impossible to even arrive at a speculative value because plaintiff refuses all demands; there are consequently no demands for them; there is therefore no flotation of prices, no basis and no fluctuation. . . . Of course, the land as at present maintained is practically useless and neither is it very ornamental. However, it must have some value. If it has value, it must be assessed. It is tangible property, capable of use and enjoyment, and the inference must be that it is carefully held for some definite purpose. The difficulty is how to fix the value."

The holding of the trial judge may be reduced to two premises, which we will discuss separately.

First, that there is no possible comparison of values. We think the court overlooked the fact that a value for grazing was actually proved. All witnesses agree that the land is no more than desert grazing land. It is not necessary to the fixation of a value for taxation that there be a sale or market value, either of the particular land or as compared with other lands. Lands must be assessed, although there be no sale or market value. Of course, sale or market value of lands comparatively situated are to be considered, but in the absence of a showing of such value, the law is that fair cash value is to be determined by reference to the value it will sustain upon a rental basis. But, granting the premise of the court, there is some basis for comparison. The assessment of former years. From the year 1905 to 1911, being the period embracing the inception, growth and collapse of the Hanford project, these lands were assessed at the average values following: 1905, $0.488 per acre. 1906, $0.53 per acre. 1908, $0.976 per

acre.  1909, $0.956 per acre.  1910, $0.976 per acre.  1911, $0.982 per acre.  The record reveals nothing that would sustain a finding that the lands were worth more in 1912 and 1913 than in the years 1908-1911, when the rosy tints of speculation which enveloped land actually subject to irrigation crept over on these lands which have no prospect of being irrigated.  Then, too, the land is on the average about of one quality.  Speaking of the two hundred sections north of the bend of the Yakima river, the county assessor testified that the land was all alike; that not a bit of it was subject to irrigation, and that not a crop was raised in the whole territory.  Yet the values as returned by the deputy assessors are not at all uniform.

Counsel for respondent seeks to justify the assessment by comparing the valuation with the prices for lands sold to irrigation companies in 1907, 1908, etc., but the testimony is clear that these lands were sold under what seemed a prospect of water for irrigation.  A ditch was either projected in the immediate future or was under construction.  It is to be noted that several of these tracts reverted to respondent. It seems to us that counsel bases his contention purely upon speculative value.  He at least inferentially admits it.  Speaking of another tract which is assessed at a lower rate, he says: "It is also rougher and *has no speculative value whatever.*" The trial judge in his memorandum finds that the land is "practically valueless," but being "tangible property," he infers "that it is carefully held for some definite purpose." This, it seems to us, is proceeding upon a fundamentally wrong basis.  It may be that there is an inconsequential acreage to be found that is assessed at about the same rate as that complained of, but in comparison it is so slight that it . would be unfair to hold that other like property is assessed at the same rate.  It does not exceed two small ownerships as compared with two hundred sections.

The second premise of the court is that value could not be fairly shown because there was no market value.  At the trial

the trial judge suggested that, some years ago, the lands owned by the appellant had been withdrawn from the market.

"The government land at that time comprised a great deal more vacant land than it does now.   In 1896 and 1897, a project was undertaken by the state ·to irrigate land under what was called the Carey Act, and the arid land department of this state surveyed the proposition, now called High Line Irrigation Project, the intention being to augment the waters in some of the lakes up above the Yakima River, up above the surface of the Yakima River and the Natches River, and irrigate those lands.   Therefore, the state, under the Carey Act, made application and had the government vacant lands withdrawn from entry under the proposition called the High Line Ditch, and simultaneously, made application to the Northern Pacific Railway Company to cooperate with them in making surveys of this High Line proposition, and to withdraw their lands from sale, so they could all be brought under the High Line Ditch, and some time after the government lands were withdrawn the Northern Pacific Railway Company acceded to the request of the state and withdrew their lands from sale under the High Line Ditch."

Appellant sought thereafter, by way of appropriate motions, for rehearing, or for leave to introduce additional evidence to show that the lands had been withdrawn and withheld under an agreement with the state, and that, since the observations of the court indicating an intention to hold against appellant upon the theory that the land had been "carefully held for some definite purpose," it had, after the trial, offered the greater part of the lands for sale at $0.96 per acre, and had actually sold 65,806 acres at $0.68 per acre; that the total assessed valuation of the 65,806 acres sold for $45,153.70 was for 1912, $147,096, and for 1913, $81,350.

The trial judge "inferred" that, because the appellant withheld these lands from sale, in a body, and refused to fix any sale price upon them or any of them, long after the state had abandoned its irrigation project with which appellant had cooperated, it "had a definite purpose regarding the

lands," by reason of which some additional value, peculiar to its "definite purpose," attached to the lands; that its long withholding of the lands from sale, and from any very profitable use, prevented the ordinary comparisons of standards of value, and that, therefore, the owner ought not to complain when the values were fixed for taxing purposes without any great degree of certainty as to their actual, fair market value.

We do not understand, as appellant supposes, that the trial court imputed any unfairness, nor do we impute any unfairness on the part of appellant in withholding its lands from sale and for as long as it desired. Any proprietor has that undoubted right. Nor is there any obligation on the part of such proprietor to disclose his ultimate designs for the use or disposition of his lands. The trial judge thought, not only that it prevented comparisons of values in the case of such large and unused bodies of land, but also, apparently, that it signified some value peculiarly within the knowledge of the owner, and peculiar to the "definite purpose" for which it was held. But we disagree with the trial judge in concluding that any undisclosed design for the use of the lands, or any "peculiar value" attaching to the peculiar use or withholding from use by the proprietor in anticipation of some possible use or demand, gives any added value immediately, or any present assessment basis. Both are, to our minds, purely conjectural. Any proprietor of lands, whether of large or small extent, may believe that, at some remote period of time, his lands will be of great value. Such belief does not add any value at the present. Some land owners demand much more for a sale of their lands than any possible buyers would be willing to give; and some owners refuse at times to place any valuation on their lands at all because of their belief that at some time there will be a greater use and a greater demand, and therefore a greater price, for their lands. In fact, to our minds, the attitude of the owner toward his lands is a very small factor, and but little to be con-

sidered in fixing the taxable, or determining the fair cash market value, of his lands. The officers of appellant testify positively that the company would have sold for less than $1 per acre, and a large part has been since actually sold; and especially in the light of the positive testimony that:

"They would take a price that the man could afford to pay. The lands have been withheld in order to prevent the exploitation of a lot of uninformed people, such as in Cold Creek, and as is being practiced in other parts of this state. I am sure they would sell them for less than a dollar an acre. I know that is what Mr. Cooper said. They would clean up everything to bring about results. But that would depend upon the ability of the purchaser to irrigate. That is the only reason they were held up."

As we view the record, the testimony preponderates in favor of appellant. All the witnesses and the trial judge admit that the land is "practically valueless" unless something that no one can foresee, or even define as a probability, happens. In other words, the lands are assessed, not at their fair value in cash as the law requires, but certainly, so far as the year 1912 is concerned, at a value that does not arise even to the dignity of speculative value. Speculative value is based upon a probability of value within at least the span of a lifetime.

Respondent relies upon our cases holding that a mere overvaluation, if not in excess of the value put upon like property similarly situated, is not enough to warrant the interposition of a court of equity, citing: *Doty Lumber & Shingle Co. v. Lewis County*, 60 Wash. 428, 111 Pac. 562, Ann. Cas. 1912 B. 870; *Edison Elec. Co. v. Spokane County*, 22 Wash. 168, 60 Pac. 132; *Northern Pac. R. Co. v. Pierce County*, 55 Wash. 108, 104 Pac. 178. The record will not sustain the application of the rule of these cases. It falls rather within the rule that a valuation for the purposes of assessment may be so grossly in excess of the fair cash value that it will not be sustained as a fair assessment whatever the valuation of other property may be. This we understand to be the rule of,

*Henderson v. Pierce County,* 37 Wash. 201, 79 Pac. 617;.
*Dickson v. Kittitas County,* 42 Wash. 429, 84 Pac. 855; *Case
v. San Juan County,* 59 Wash. 222, 109 Pac. 809.

This case is controlled by *Case v. San Juan County, supra.*
After saying that it is impossible for an assessing officer to
fix the value of wild land with any degree of certainty, the
court held upon the record that the values fixed by the county
assessor, and approved by the court below, were unreasonable
and oppressive, and found little support in the testimony.
It is so in this case. There is no testimony to sustain a val-
uation other than as desert grazing land. As in the case
just cited, the lands are wild and unimproved, and aside
from a possible speculative value, they did not exceed a value
fixed by the witnesses at from ten cents to $1.25 an acre.
In that case the assessment was made upon an understanding
that the parties had been offered the sum of $50,000 for the
property. The testimony revealed the fact that a condition
was attached to the offer; that is, if the owners would pay
$6,000 or $7,000 for development work and would demon-
strate that there was sufficient limestone upon the land to
operate a cement plant with a capacity of 1,000 barrels per
day for a period of 21 years, that the land would be pur-
chased. Of it the court said:

"Such an offer is of no moment in fixing the present cash
value of property unless coupled with the showing that these
conditions were possible of fulfilment, and no such showing
was made or attempted here. Such an offer might safely be
made for land containing no mineral whatever."

It is so in this case. The actual value of the property
upon a rental basis is shown. Beyond that the values are
grounded in the sheerest speculation, unsustained by any
testimony that the land may at some future time be subject
to irrigation.

The judgment of the lower court will be modified. The
assessment will be sustained upon all of the lands other than
two hundred sections lying north of the horn of the Yakima

river and west of the Columbia.   The valuation of these sec-
tions, for the purposes of entering a decree in this case, will
be fixed at the sum of $1 per acre in all instances where the
assessment exceeds that sum; otherwise, they will take the
value fixed by the board.   Costs will be allowed in the lower
court in proportion to the final recovery of each party.   Ap-
pellant will recover costs in this court.   In ascertaining the
tax, the court will take fifty per cent of the valuation as
found by this court, that being the percentage at which other
property is assessed.

The case is remanded with instructions to enter a decree
accordingly.

MORRIS, C. J., FULLERTON, ELLIS, and MOUNT, JJ., concur.